## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
### DIVISION OF ST. THOMAS AND ST. JOHN

ISLAND SAINTS LLC D/B/A BELLOWS    )
INTERNATIONAL,    )    **Case No. 3:24-cv-0051**
    )
        **Plaintiff,**    )    **ACTION FOR TRADEMARK**
    )    **INFRINGEMENT, DECLARATORY**
    **v.**    )    **JUDGMENT, TEMPORARY**
    )    **RESTRAINING ORDER AND**
**CARDOW, INC.,**    )    **PRELIMINARY INJUNCTION**
    )
        **Defendant.**    )
_____ )

**ATTORNEYS:**

CARL A. BECKSTEDT, III, ESQ.
BECKSTEDT & KUCZYNSKI LLP
CHRISTIANSTED, U.S.V.I.
    *For Plaintiff Island Saints, LLC d/b/a* Bellows International,

KANAAN LE'ROY WHILHITE, ESQ.
THORON COREY HODGE, ESQ.
MOORE, DODSON, RUSSELL, & WILHITE, P.C.
ST. THOMAS, U.S.V.I.
    *For Defendant Cardow, Inc.*

### <u>MEMORANDUM OPINION</u>

**Molloy, Chief Judge.**

    **BEFORE THE COURT** is Plaintiff Island Saints LLC, d/b/a Bellows International's ("Bellows") motion for a temporary restraining order and preliminary injunction, filed on October 8, 2024. (ECF No. 2). To the extent Bellows sought a temporary restraining order ('TRO"), that motion was granted on October 24, 2024. (ECF No. 18). Now before the Court is Bellows' motion for a preliminary injunction.

    The Court held a two-day hearing on Bellows' request for a preliminary injunction on October 28 and 30, 2024. At the conclusion of the hearing, the parties consented to extending the TRO to November 25, 2024, and a briefing schedule was set. Defendant Cardow, Inc. ("Cardow") filed its opposition on November 8, 2024 (ECF Nos. 46, 47) and Bellows filed its

reply on November 15, 2024. (ECF No. 51). For the reasons set forth herein, the Court will grant Bellows' motion for a preliminary injunction.

## I.    FACTUAL BACKGROUND[1]

Magens Bay Beach ("Magens Bay") in the U.S. Virgin Islands is considered a must-see for St. Thomas visitors by plane and boat. The serene stretch of palm trees and crystal blue ocean is also a cherished gem to the locals. It's a rare day to not hear Soca music playing from the beach sheds where families and friends gather. There is also a beach bar at Magens Bay, and few adults—tourists and locals alike —leave without sampling one of the many rum drinks listed on the menu. This case centers on two bottles of "Magens Bay Rum" sold by two different companies—and both labeled with the same trademark "Magens Bay Rum."

**The parties.**

Bellows is a beverage distribution division of Island Saints LLC, that sells beer, liquor, and wine in the U.S. Virgin Islands. For nearly twenty years Bellows has tailored its "Magens Bay Rum" brand to a single source buyer —Magens Bay Concessions, Inc. ("Magens Bay Concessions".).[2] Bellows entered into a verbal agreement with Magens Bay Concessions in 2005, to produce and exclusively sell "Magens Bay Rum" at Magens Bay, and it has never sold its "Magens Bay Rum" anywhere else.[3]

Bellows began developing the concept of its "Magens Bay Rum" brand in the 1990s. The rum is sourced from an undisclosed location in the Caribbean and bottled by a company

---

[1] The Court adduced the following facts from the testimony and exhibits introduced at the hearing on Bellows' motion for preliminary injunction, held October 28 and 30, 2024.

[2] Magens Bay was donated to the Government of the Virgin Islands ("GVI"), and GVI subsequently created Magens Bay Authority ("MBA") for the preservation and operation of Magens Bay. Title 32 V.I.C. § 51 establishes MBA as a corporate instrumentality of the GVI. MBA administers the food and beverage concessions at Magens Bay, including beach rentals, a beach bar, and a boutique gift shop.

[3] Magens Bay Concessions, Inc. lost its lease with MBA in December 2023 and was replaced with a new tenant, Elevated Hospitality LLC d/b/a Fairchild's ("Fairchild's"). Bellows continued to sell its rum to Fairchild's until May 2024. Magens Bay Concession, Inc. was operated by the Dimopoulos family, who had a long-term operating agreement with MBA, that gave it the exclusive right to sell food and drinks at the concession, rent beach chairs, and sell items at the boutique. MBA does not regulate or determine who the bar operator contracts with to buy liquor.

in Louisville, Kentucky, with "Magens Bay Rum" on the labeling.[4] Bellows imports its "house branded rum" into the U.S. Virgin Islands under the trademark "Magens Bay Rum," and has sold rum under the "Magens Bay Rum" trademark continuously at Magens Bay since 2005. In its first year, Bellows sold 79 cases. In 2022, 766 cases were sold, and by 2023, Bellows sold 1,158 cases of its "Magens Bay Rum." Overall, Bellows has sold a total of 10,173 cases or 122,076 bottles in the Virgin Islands generating over $458,000.00 in gross revenue from its "Magens Bay Rum" sales.

Cardow, an established jewelry dealer on St. Thomas, also asserts ownership of the "Magens Bay Rum" trade name. Cardow also sells retail alcohol and liquor. Although Cardow claims ownership of the "Magens Bay Rum" trademark, it has given exclusive rights to sell and distribute rum under the "Magens Bay Rum" label to a relatively new company — Cardow Wines and Spirits ("CWS"). The two companies are separately owned; however, CWS' owner, Paul de Lyrot, is also employed by Cardow as treasurer and director of its wines and spirits division.[5]

In 2020, Cardow, by and through Paul de Lyrot, began producing its own rum brand, and in October 2023 it began development of "Magens Bay Rum" for CWS to import and distribute. De Lyrot registered "Magens Bay Rum" as a trade name with the Division of Corporations and Trademarks at the Office of the Lieutenant Governor – United States Virgin Islands, in October 2023. The mark had not been previously registered. Between December 2023 and January 2024, Cardow began designing its "Magens Bay Rum" labels and arranging with its bottling company to start production. Cardow's "Magens Bay Rum" is sourced from the Virgin Islands, bottled and labeled in New Jersey, and imported into the Virgin Islands

---

[4] Bellows initially asserted that its rum was distilled in Kentucky (See ECF No. 3 at 2), however Bellows provided testimony at the preliminary injunction hearing that its rum is actually distilled in the Caribbean and bottled in Kentucky. Due to its non-disclosure agreement with the company that sources its rum, Bellows cannot disclose where its rum is sourced from specifically in the Caribbean.

[5] At the October 28, 2024 preliminary injunction hearing, Paul de Lyrot testified that he started CWS in 2020 or 2021, and that both he and his sister own CWS; he also testified that both family members are also employed with Cardow, a family business that he has worked at as far back as 2011.

under the "Magens Bay Rum" label.[6] In March 2024, CWS began distribution of its "Magens Bay Rum" to a variety of customers, including retail outlets, on St. Thomas. After just eight months, Cardow was earning approximately $1,500 per month in profit from the sale of its "Magens Bay Rum" at all 18 of its customers' locations, with an estimated profit margin of 15 percent. In May 2024, Cardow filed an application with the U.S. Patent and Trade Office ("USPTO") for registration of the "Magens Bay Rum" mark.

Meanwhile, Bellows continued to sell its "Magens Bay Rum" to Fairchild's until May 2024, when the concessions manager, Patricia LaCorte ("LaCorte"), contacted Bellows to remove the rum because the Department of Licensing and Consumer Affairs ("DLCA") had informed her that she could no longer sell it.

### The Department of Licensing and Consumer Affairs (DLCA)

Pursuant to 8 V.I.C. § 152, Bellows and Cardow are required to have the DLCA's approval before selling rum under any label in the Virgin Islands.[7] In 2005, Bellows submitted its "Magens Bay Rum" label to DLCA and received approval, which at the time consisted of a signature by a DLCA officer on the page containing the label, with a copy provided to Bellows for its records. DLCA also approved Cardow's "Magens Bay Rum" label— submitted by de Lyrot—on January 11, 2024. Def. Ex. 3. De Lyrot testified that he had contacted DCLA beforehand, and that according to DLCA's records, no one else on St. Thomas was distributing any other liquor under a similar brand name or mark.

De Lyrot testified that it wasn't until March 2024 that he became aware of another rum sold under the "Magens Bay Rum" label. Bellows, on the other hand, learned that Cardow

---

[6] Due to its non-disclosure agreement with the company that sources its rum, CWS cannot disclose where specifically in the Virgin Islands its rum is sourced from.

[7] Title 8 V.I.C. § 152 provides that "No person subject to the licensing provisions of chapter 1 of this title shall ship, transport, receive, deliver, sell or offer for sale any alcoholic beverages within the United States Virgin Islands until the following information has been filed with the Board: (1) the name of the brand, trade name or other distinctive characteristic by which such alcoholic beverages are bought and sold; 2)the name and address of the brewer, distiller or manufacturer thereof; (3)the name and address of each wholesaler or importer who is authorized to sell such alcoholic beverages in the United States Virgin Islands by the brewer, distiller, manufacturer or his authorized representative and the alcoholic content, if greater than six percentum by volume; provided, however, the wholesaler or importer shall certify the alcohol content by volume for any alcoholic beverage that does not bear such information on its label; and until such brand, trade name or other distinctive characteristic has been approved by the Board."

had registered the "Magens Bay Rum" mark with DLCA when it received a cease-and-desist letter from DLCA in late May 2024. Pl. Ex. 14. The DLCA's letter directed Bellows to discontinue selling rum under the mark "Magens Bay Rum" because the product was "registered and copyrighted by another entity." *Id.*

Despite DLCA's assertion that it has no record of Bellows' registration for its "Magens Bay Rum" label, Bellows presented a copy of a letter that it had sent to the DLCA in 2016 seeking approval of a label revision for its "Magens Bay Rum", as required under 8 V.I.C. § 152. Pl. Ex. 4. The label was submitted for approval to the DLCA, and a signed copy was received on May 9, 2016, indicating that Bellows was allowed to move forward. Pl. Ex.5. Bellows contends that it has lost more than 50% of its anticipated revenue from 2024 as a result of the DLCA's cease and desist letter.

On October 8, 2024, Bellows filed its Complaint, alleging six causes of action:[8] Count One seeks declaratory judgment as to Bellows' rights in the mark "Magens Bay Rum"; Count Two seeks declaratory judgment establishing that Cardow's mark lacks secondary meaning; Count Three alleges federal trademark infringement pursuant to 15 U.S.C. §1125(a) under the Lanham Act; Count Four alleges common law trademark infringement; Count Five alleges common law unfair competition; and Count Six alleges unlawful and/or unfair business practices pursuant to 14 V.I.C § 2172. ECF No. 1. Bellows now petitions the Court for injunctive relief pursuant to Count Three.

## II.     LEGAL STANDARD

Rule 65 of the Federal Rules of Civil Procedure governs the issuance of preliminary injunctions. *See* Fed. R. Civ. P. 65. Courts apply a four-factor test when considering whether to grant preliminary relief. *See Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). Specifically, a movant must demonstrate: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that public interest favors such relief.  *Id.* (citing *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir.

---

[8] Bellows' Complaint misnumbers Count 6 as Count 5, and it lists two counts as Count IV (Count IV Common Law Trademark Infringement and Count IV Unfair Competition). *See* ECF No. 1.

1999). The first and second factors are "gateway factors" that the movant must establish. *Amalgamated Transit Union Local 85 v. Port Auth. of Allegheny Cty.*, 39 F.4th 95, 103 (3d Cir. 2022). If these two gateway factors are satisfied, a court then determines whether "all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.*

Preliminary injunctive relief is "an extraordinary remedy" and "should be granted only in limited circumstances." *American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1427 (3d Cir.1994) (quotation omitted). "[O]ne of the goals of the preliminary injunction analysis is to maintain the status quo, defined as the last, peaceable, noncontested status of the parties." *Opticians Ass'n of Am. v. Indep. Opticians of Am.,* 920 F.2d 187, 197 (3d Cir.1990) (citation and quotation omitted); *see also Kos Pharms.,* 369 F.3d at 708 (citing 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 30:50 (4th ed. 2003) ("The status quo to be preserved is not the situation of contested rights. . . . In a trademark case, [it] is the situation prior to the time the junior user began use of its contested mark: the last peaceable, non-contested status.")).

## III.   DISCUSSION

"The Lanham Act was intended to make actionable the deceptive and misleading use of marks, and to protect persons engaged in commerce against unfair competition." *Dastar Corp. v. Twentieth Century Fox Film Corp.,* 539 U.S. 23, 28 (2003) (citing 15 U.S.C. § 1127). The Act defines trademark infringement as use of a mark so similar to that of a prior user as to be "likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1). Likelihood of confusion under the Act is not limited to confusion of products; confusion as to source is also actionable. *See, e.g., Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 472 (3d Cir. 1992) (finding likelihood of confusion "exists when the consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark") (citation omitted).

The Lanham Act's unfair competition provision provides that:

(a)(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which— (A) is likely to cause confusion, or to cause mistake, or to deceive as

to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

As the prior user of the "Magens Bay Rum" mark, Bellows petitions the Court for injunctive relief pursuant to 15 U.S.C. §1125(a) of the Lanham Act.  The Court now turns to its analysis.

## A. Likelihood of Success on the Merits

The first element that Bellows is required to prove to succeed in its motion for preliminary injunction is that it is likely to succeed on the merits. "A trademark is defined in 15 U.S.C. § 1127 as including "any word, name, symbol, or device or any combination thereof" used by any person "to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, (1992). To prove federal trademark infringement, "a plaintiff must demonstrate that (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion." *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000) (citing *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency*, Inc., 214 F.3d 432, 437 (3d Cir. 2000)). Even after satisfying these elements, however, "relief is limited in scope to where market penetration is significant enough to pose the real likelihood of confusion among the consumers in that area." *Parks LLC v. Tyson Foods, Inc.*, 863 F.3d 220, 230 (3d Cir. 2017) (citation omitted).

### 1. Whether Bellows has a Valid and Legally Protectable Mark.

The first two requirements, validity and legal protectability, may be proven whether a mark is federally registered or not. *United States Pat. & Trademark Off. v. Booking.com B. V.*, 591 U.S. 549, 553 (2020) ("Even without federal registration, a mark may be eligible for protection against infringement under both the Lanham Act and other sources of law."); 15 U.S.C. § 1057(c)(1) ("the filing of the application to register [a trademark] shall . . . confer[] a

right of priority, nationwide in effect, . . . against any other person except for a person . . . **who, prior to such filing, has used the mark.**") (emphasis added); *see also Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) ("[I]t is common ground that § 43(a) of the Lanham Act protects qualifying unregistered trademarks and that the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a).").

"The Lanham Act protects unregistered marks to the same extent as registered marks because trademark rights emanate from use and not merely registration." *Duffy v. Charles Schwab & Co.*, 97 F. Supp. 2d 592, 598 (D.N.J. 2000) (citations omitted).  If the mark has not been federally registered, however, it is only valid and legally protectable if the plaintiff shows that the mark is inherently distinctive or has secondary meaning. *Parks*, 863 F.3d at 230.

### a.  Inherently Distinctive Marks

A mark is inherently distinctive if "its intrinsic nature serves to identify a particular source." *Wal-Mart Stores v. Samara Bros.*, 529 U.S. 205, 210, (2000). Trademark law evaluates marks along a continuum of distinctiveness, from the inherently distinctive to the nondistinctive.[9] The Third Circuit has characterized these categories as: arbitrary (or fanciful) terms, which bear "no logical or suggestive relation to the actual characteristics of the goods;" suggestive terms which suggest rather than describe the characteristics of the goods; descriptive terms, which describe a characteristic or ingredient of the article to which it refers, and generic terms, which function as the common descriptive name of a product class. *A.J. Canfield Co. v. Honickman,* 808 F.2d 291, 296 (3d Cir.1986). "The most distinctive marks—those that are 'arbitrary' ('Camel' cigarettes), 'fanciful' ('Kodak' film), or 'suggestive' ('Tide' laundry detergent)" —are 'inherently distinctive.'" *Wal-Mart Stores,* 529 U.S. at 210–211.

---

[9] Distinctiveness for purposes of trademark registration is often expressed on an increasing scale: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. Lanham Trade-Mark Act § 2, *United States Pat. & Trademark Off. v. Booking.com B. V.,* 591 U.S. 549, 553 (citing Two *Pesos, Inc.* v. *Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).

If a mark is found not to be inherently distinctive, then "secondary meaning must be proven before such a name will be protectable." *Parks*, 863 F.3d at 223. "[M]arks that are merely descriptive of the product" are not considered inherently distinctive and "secondary meaning must be proven before such a name will be protectable." *Id.* "A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods. If the mental leap between the word and the product's attributes is not almost instantaneous, this strongly indicates suggestiveness, not direct descriptiveness." *Zany Toys, LLC v. Pearl Enters., LLC*, Civil Action No. 13-5262 (JAP) (TJB), 2014 U.S. Dist. LEXIS 70852, at *19 (D.N.J. May 23, 2014) (Citation omitted).

### b. Secondary Meaning

"Secondary meaning" is a term of art in trademark law that refers to a mental association in buyers' minds between the alleged mark and a single source of the product. *Parks*, 863 F.3d at 226. It exists when the mark is "interpreted by the consuming public to be not only an identification of the product or services, but also a representation of the origin of those products or services." *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1228 (3d Cir. 1978). There is no consensus as to the elements of secondary meaning. *American Scientific Chemical, Inc. v. American Hospital Supply Corp.*, 690 F.2d 791, 792 (9th Cir. 1982). The Third Circuit has relied on the following non-exclusive list of factors, to the extent relevant: sales and advertising leading to buyer association; length of use; exclusivity of use; the fact of copying; customer surveys; customer testimony; the use of the mark in trade journals; the size of the company; the number of sales; the number of customers; and actual confusion. *Parks*, 863 F.3d at 231.

Bellows contends that its unregistered mark has acquired secondary meaning.

### i. Sales and advertising leading to buyer association.

"A plaintiff might establish secondary meaning through evidence of advertising and sales growth." *E.T. Browne Drug Co. v. Cococare Prods.*, 538 F.3d 185, 189 (3d Cir. 2008). A reasonable inference can be made that a term has gained secondary meaning by showing use over a long period of time in a prevalent advertising campaign, for example. *Id.* Evidence of simultaneous revenue growth would strengthen that inference. *Id.* Extensive advertising

creates an association in the minds of consumers between the mark and the source of the products advertised under the mark. *Parks*, 863 F.3d at 231 (citation omitted).

Bellows points to the continuous and increasing sales of its "Magens Bay Rum" from 79 cases in 2005 to 1,588 cases sold in 2023.[10] In terms of advertising, Bellows initially represented that it "expended significant money in advertising, promoting and selling" its "Magens Bay Rum", and that its "Magens Bay Rum" trademark became very successful through its marketing and promotion efforts." See ECF No. 3-1 ¶¶ 9 & 11. However, at the preliminary injunction hearing, Bellows' General Manager acknowledged that since Bellows' rum is sold to a single vendor, the leaseholder of the concessions at Magens Bay, there was no need for Bellows to incur any advertising or marketing costs because it had only intended to sell the product to the bar at Magens Bay. In the way of advertising, Bellows presented little beyond creating various drink menus that listed its rum as an ingredient at the Magens Bay bar and installing a sales rack with pricing in the Magens Bay boutique store for an unclear period of time. Bellows also represents that its rum was advertised on social media in multiple posts that received positive responses. Pl. Ex. 7 and Def. Ex. 10.

As Cardow argues, Bellows provides little evidence in the way of actual advertising costs incurred or estimates of costs in support of its "Magens Bay Rum" label and Bellows itself has never posted its "Magens Bay Rum" brand on any social media sites. According to Bellows, it is inconsequential whether Bellows or another party posts on social media because the posted images of its "Magens Bay Rum" support the fact that there is customer recognition of its brand. While this may be true, it does not support Bellows' claim that it "expended significant money in advertising" such as would create the necessary mental association between the mark and the product. The Court finds that Bellows' demonstrated sales growth leans towards evidence of buyer association; however, its lack of advertising does not. This factor cuts against a finding of secondary meaning.

ii.    **Exclusivity and Length of Use of the "Magens Bay Rum" mark.**

---

[10] Bellows' brief states "1,1588" cases of its "Magens Bay Rum" were sold in 2023, and the Court recognizes this as a typographical error. *See* ECF No. 51 at 11.

Bellows argues that it has been using the "Magens Bay Rum" mark continuously for nearly twenty years to market its rum in the Virgin Islands and was doing so exclusively until Cardow began selling its rum under the same mark. No one factor is dispositive, but the length of time that Bellows has exclusively used the "Magens Bay Rum" mark in commerce weighs heavy in Bellows' favor. Cardow argues that Bellows "has never had exclusive use of the mark due to its arrangement with The Magens Bay Concession to exclusively sell 'Magens Bay Rum.'" According to Cardow, this constituted a sharing of the mark. ECF No. 46 at 14. For support, Cardow cites to *VI Carnival Committee, Inc. v. Boschulte*; however, that case is distinguishable from the instant matter, because the record in *VI Carnival* clearly demonstrated a multi-year period of cooperation between the parties, as well as joint use of the disputed trademarks to promote annual events through those years.[11] Here, all the record shows, is a "gentleman's agreement" between a retail concessions leaseholder and a beverage distributor for exclusive rights concerning the sales of a uniquely labeled product. The leaseholder of the concessions purchases items for resale, and nothing in the record demonstrates an ownership interest in any items sold at the concessions, much less the rum label. Cardow provides no evidence to support its assertion that the concessions leaseholder at Magens Bay possessed any ownership interest in the "Magens Bay Rum" mark. A contractor's exclusive right to sell "Magens Bay Rum" does not equate to an ownership interest in the trademark of the product it sells. Most importantly, there is no evidence that either contractor—The Magens Bay Concessions or the new tenant, Fairchild's—ever claimed ownership of the mark or even attempted to register the mark in the Virgin Islands or elsewhere. Bellows has continuously and exclusively sold its rum in the Virgin Islands under the "Magens Bay Rum" label for nearly twenty years. This factor weighs in favor of secondary meaning.

### iii.    Evidence of copying.

Bellows maintains that Cardow copied its "Magens Bay Rum" mark and points out that CWS' owner Paul de Lyrot "had frequented Magens Bay Concession and Fairchild's for years,

---

[11] *See VI Carnival Comm., Inc. v. Boschulte*, No. 3:22-cv-0019, 2022 U.S. Dist. LEXIS 140476 (D.V.I. Aug. 8, 2022).

*Island Saints LLC, d/b/a Bellows Int'l v. Cardow, Inc.*
Case No. 3:24-cv-0051
Memorandum Opinion
Page **12** of **31**

had a business relationship with Fairchild's manager, Patricia LaCorte, and was told by LaCorte that Fairchild's already sold a "Magens Bay Rum" before CWS began selling its own version of "Magens Bay Rum."

In its defense, Cardow asserts that the only evidence of copying is that both parties use the same name. ECF No. 46 at 16.  Cardow contends that "it is not surprising at all" that it would seek to capture recognition of Magens Bay —"literally the most famous landmark in the U.S. Virgin Islands"— with its new brand. ECF No. 46 at 16.

Employing the identical tradename on a like product to "capture recognition of Magens Bay" may not be surprising to Cardow, but it is very surprising to the Court considering de Lyrot's testimony, which the Court found to be suspect and unreliable.

CWS' owner de Lyrot testified that he had never heard of or seen Bellows' trademark before early March 2024. De Lyrot also testified that the manager of Fairchild's, LaCorte, informed him in January 2024 that another "Magens Bay Rum" label was on the market. Clearly, LaCorte would know since Bellows' "Magens Bay Rum" was kept in stock at Fairchild's where LaCorte was the manager. De Lyrot testified that although he was ***specifically and explicitly*** told that another "Magens Bay Rum" brand already existed, he did not investigate further because he did not believe LaCorte. He stated that he thought LaCorte was mistakenly referring to "Magens Bay Reserve."  Nothing on the record indicates the existence of a "Magens Bay Reserve" label and de Lyrot was unable to express from where he obtained this notion. The Court finds de Lyrot's testimony on this issue not credible.

In addition, the record shows that de Lyrot approached LaCorte with his new label— a copy of which LaCorte then texted to a representative of Bellows on Dec 6, 2023. Pl. Ex. 13; ECF No. 51 at 17. It is difficult to conceive that LaCorte would not have mentioned Bellows' "Magens Bay Rum" label to de Lyrot at that time.

The Court is hard pressed to believe that a businessman with de Lyrot's level of sophistication would not have inquired more aggressively as to whether another "Magens Bay Rum" label existed on the island of St. Thomas before assuming that the source of that information was mistaken. De Lyrot testified that he has frequented the concessions at Magens Bay for years; he is in the business of liquor sales as owner of CWS and as treasurer

and director of Cardow's wines and spirits division; and he has had a business relationship with LaCorte since well before she became manager of Fairchild's. This all suggests that if he did not already know of Bellows' "Magens Bay Rum" at the time, he should have known to investigate whether another rum brand with the exact same name existed when the information was presented to him.

De Lyrot's grade school friend, Bernard Feve ("Feve"), testified that he has worked for the past five years at the concessions bar at Magens Bay serving the Bellows' "Magens Bay Rum" brand. Feve first heard of Bellows' "Magens Bay Rum" the year before he was hired when he was scouting the bar for work. Surely if a bar tender scouting out a job learned of Bellows' label at Magens Bay, de Lyrot— the owner of a liquor distribution business— could likely have learned of the brand before March 2024—the same month that he began selling his own brand of rum under the nearly exact same label. This factor weighs heavily in favor of secondary meaning for Bellows' brand.

### iv. Customer surveys and the use of the mark in trade journals.

Bellows did not provide consumer surveys, and the Court stated from the bench that such surveys may not be required under Third Circuit precedent. *See Parks, LLC v. Tyson Foods, Inc.*, 186 F. Supp. 3d 405, 425 (E.D. Pa. 2016), *judgment entered,* No. 5:15-CV-00946, 2016 WL 2646739 (E.D. Pa. May 10, 2016), and *aff'd sub nom. Parks LLC v. Tyson Foods, Inc*, 863 F.3d 220 (3d Cir. 2017) ("A party seeking to establish secondary meaning is not required to submit a survey to prevail. Nonetheless, survey evidence when it is available, may be "direct and persuasive evidence of secondary meaning.") (citations omitted). This factor carries no weight in the analysis.

### v. Customer testimony.

Bellows provides evidence of customer testimony by way of responses to several social media posts promoting its "Magens Bay Rum," which included a Facebook user exclaiming 'Best RUM in the world,'" and another post where Bellows' "Magens Bay Rum" mark is "advertised with the phrase 'Come down and start your rum diet today at Magens Bay,' which elicited several likes and responses asking if the product can be shipped to Florida

or Michigan. *See* Pl. Ex. 23; Pl. Ex. 7; Def. Ex. 10. The posts indicated that they had been shared on social media by Magens Bay Beach Bar, Café & Boutique.

Cardow argues that Bellows did not present a single witness who consumed Bellows' "Magens Bay Rum" by name or who testified that Bellows' "Magens Bay Rum" is their favorite rum. ECF No. 46 at 17. Alternatively, Cardow's witness, Feve, a St. Thomas local and an on-island bartender for nearly 20 years, testified that he only learned of "Magens Bay Rum" the year before he began working at Magens Bay.  Before that, during all his previous years of employment on St. Thomas as a bartender, he had never heard of Bellows' rum. Feve also testified that he did not know anyone to order "Magens Bay Rum" as a preferred drink at Magens Bay, nor did he know of anyone who actually comes to the Magens Bay bar to drink Bellows' version of "Magens Bay Rum".

Barbara Petersen, another witness and the current Chairperson of the Board of Directors for Magens Bay Authority, also testified that she has lived on St. Thomas her entire life, that she drinks rum occasionally, and that she had never seen or heard of Bellows rum before she became aware of the instant dispute.

The record is thin; however, the burden here belongs to Bellows. This factor does not advance Bellows' claim of secondary meaning.

### vi.    Size of the company and number of sales and customers.

"Information about a company's size, the number of sales made under the mark, and the number of customers can also be probative evidence of secondary meaning, the inference being that [t]he larger a company and the greater its sales, the greater the number of people who have been exposed to this symbol used as a trademark." *Parks,* 186 F. Supp. 3d at 423 (citing 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 15:49. Westlaw (database updated Mar. 2016)).

Bellows intentionally created its product to target one client—the concessions at Magens Bay along with its consumers. Bellows maintains that it has generated over $458,000 in gross revenue from its "Magens Bay Rum" sales and its sales have grown consistently since first entering the market in 2005. Cardow argues that the sales data presented by Bellows only shows bulk sales at Magens Bay since there were no sales anywhere else and the

concessions at Magens Bay has been Bellows' only customer for this product. Cardow further argues that the only geographic area where Bellows' mark could have acquired any secondary meaning is limited to Magens Bay, and even so, it is not probative of secondary meaning because it does not prove that its mark is interpreted by the consuming public as a representation of the product's manufacturing source. ECF No. 47 at 17, 18.

The Court finds this factor to be neutral. First, neither party has provided any information regarding the size of Bellows as a company, and it only sells to one customer. Bellows' growing sales supports the inference that the number of consumers has increased, but this alone is not enough to demonstrate the number of consumers that make the requisite association between source and mark. Second, while Bellow's sales figures are undisputed, these raw figures are uninformative. While greater sales weigh in favor of secondary meaning, "[r]aw sales figures need to be put into context to have any meaning." *Parks*, 863 F.3d at 235 (quoting J. Thomas McCarthy, *2 McCarthy on Trademarks and Unfair Competition* § 15:49 (4th ed. 2017)) For example, in *Parks*, the Third Circuit contextualized the sales figures by analyzing the plaintiff's market share rather than its raw sales numbers. *Id.* No such context has been provided here and the range of the sales on their face are not so large that one could reasonably infer secondary meaning—especially considering Bellows has up to now only sold its rum to the concessions at Magens Bay Beach. Given the thin record at hand— neither side has provided information regarding Bellow's size or the context of its sales figures in its market.

**vii.    Actual confusion.**

Bellows concedes little evidence exists as to actual confusion. Considering that Bellows only sells its rum to one client, and Cardow's label has been on the market less than a year, there is minimal evidence of actual confusion during the eight months Cardow's version of "Magens Bay Rum" has been on the market. ECF No. 3 at 12. This factor weighs against secondary meaning.[13]

---

[13] "Cardow concedes that two 'Magens Bay Rum' marks could cause actual confusion in the minds of the public" and argues that the measured class of consuming public should, at a minimum, include potential purchasers of alcohol from the entirety of the USVI as opposed to only the consumers that purchase alcohol at the Magens Bay beach concessions. ECF No. 46 at 19.

As to the balance of factors for purposes of the instant motion, the Court finds in favor of secondary meaning by a very slim margin. A preliminary injunction is an extraordinary remedy that is aimed at maintaining the last, peaceable, noncontested status of the parties, which, in this case, is before Cardow entered the market with its rum. Bellows argues confidently that the thin record at hand—coupled with the fact that its "Magens Bay Rum" brand was intentionally created for exclusive sales to one customer—is enough to persuade a factfinder that consumers in the relevant market associate its "Magens Bay Rum" mark with Bellows. Although slim, the Court finds Bellows' evidence of secondary meaning sufficient to warrant a preliminary injunction.

The Court takes note that CWS has applied for federal trademark protection for a nearly identical mark, and by doing so inherently acknowledges CWS' belief that the mark is potentially valid and protectable. Because it obviously took the position that its "Magens Bay Rum" mark is distinctive or has secondary meaning by applying for registration with the USPTO, Cardow cannot now convincingly argue that Bellows' "Magens Bay Rum" mark is not.

### c. Claims under False Designation of Origin U.S.C. 15 § 1125.

Cardow argues that Bellows' mark is not legally protectable pursuant to § 1052(a) because it includes a "geographical indication other than the origin of its rum." ECF No. 46 at 6. "As a matter of law," Cardow argues, "Magens Bay, USVI is a geographic location other than the actual origin of the Bellows' rum, which is an unidentified Caribbean nation." Therefore, according to Cardow, "Bellows can never prove trademark infringement because it has no legally protectable trademark, which is the first element of a trademark infringement case." ECF No. 46 at 6.

Section 43(a) of the Lanham Act creates civil liability for any person who

in connection with any goods or services, ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person. Or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's

goods, services, or commercial activities, shall be liable in a civil action by any
person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125.

"Accordingly, to succeed on these claims, Plaintiff must show that Defendant (1) uses a
designation, (2) in interstate commerce, (3) in connection with goods, (4) which designation
is likely to cause confusion, mistake, or deception as to (5) the origin, sponsorship, or
approval of Defendant's goods, and (6) Plaintiff has been or is likely to be damaged by these
acts". *First Keystone Fed. Sav. Bank v. First Keystone Mortg., Inc.*, 923 F. Supp. 693, 707 (E.D.
Pa. 1996).

Cardow argues that Bellows may not allege trademark infringement because Bellows'
mark violates the Lanham Act by referencing Magens Bay when Bellows' rum is not sourced
from Magens Bay— "leading consumers to believe the product emanates from a different
source of geographic origin."[15] ECF No. 46 at 8. Cardow contends that although Bellows' rum
is not made in the U.S. Virgin Islands, "its mark invokes and pretends to convey that it is."
ECF No. 46 at 8. Cardow asserts that a goods-place association is to be made between the
trademark and Magens Bay, and because Bellows' rum is not actually made at Magens Bay,
St. Thomas, or even in the US Virgin Islands, its label is essentially deceptive.[16] *Id.* at 5.

In response, Bellows argues that its mark is not false or misleading because the
"Magens Bay Rum" label truthfully and accurately discloses that Bellows' rum is made with
Caribbean rum, and it does not specifically identify Magens Bay as the place of origin for its
"Magens Bay Rum." ECF No. 51 at 8, 10. Bellows asserts that Magens Bay Rum is a product
that is exclusively produced for visitors to the bay and that its label is "meant to evoke the

---

[15] Cardow cites *Scotch Whisky Ass'n v. Barton Distilling Co.,* but the case is distinguishable. The trademark in
*Scotch* could not be protected because the whiskey at issue was made in Panama and the bottle's label did not
mention Panama as the source of its rum. The Panamanian whiskey only contained Scotch as an ingredient, and
because Scotch is generally known to come from Scotland or the U.K, the term Scotch in the label was read as
falsely designating the source of the Panamanian whiskey to Scotland or the U.K. In the instant case, Magens
Bay is not generally known as a source of rum. Furthermore, Bellows' label does not claim that its rum is made
at Magens Bay. The label identifies the rum accurately as being made in the Caribbean. *See Scotch Whiskey Ass'n
v. Barton Distilling Co.,* 338 F. Supp. 595, 597 (N.D. Ill. 1971), *aff'd in part, rev'd in part,* 489 F.2d 809 (7th Cir.
1973) (affirming the grant of the injunction but reversing the district court's award of legal fees).

[16] The irony is not lost on the Court that Cardow's argument could potentially invalidate its own mark, since the
rum it markets under Cardow's "Magens Bay Rum" label also does not originate from Magens Bay.

experience of Magens Bay," and not meant to designate the origin of the rum. ECF No. 51 at 10.

Bellows cites to *Pernod Ricard USA LLC v. Bacardi U.S.A., Inc.*, 702 F. Supp. 2d 238, 250 (D. Del. 2010), stating that "labeling cannot be deceptive as to geographic origin where it contains a truthful disclosure of the product's source." *See Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.,* 653 F.3d 241, 250 (3d Cir. 2011) (finding rum labeled as "Havana Club" not to be misleading for false advertising purposes where the bottle's label clearly stated that the rum was sourced from Puerto Rico).

In *Pernod*, the defendant Bacardi began selling a Puerto Rican rum under the label "Havana Club." Shortly after, the plaintiff Pernod filed a false advertising suit under Section 43(a)(1)(B) of the Lanham Act, asserting that the labeling of Bacardi's bottle, specifically the use of the words "Havana Club," misleads consumers to believe that the rum is produced in Cuba. *Pernod Ricard,* 702 F. Supp. 2d at 246. Bacardi's bottle label stated that Havana Club is a "Puerto Rican Rum" crafted in Puerto Rico, and because the label clearly and truthfully provided the origin of Bacardi's rum, the court found that the label was not deceptive.[17] *Id. at* 251.

Here, Bellows makes no claim of any particular country as the source of its rum, but its label truthfully states that its rum is from the Caribbean. It does not claim that its rum is made in Magens Bay. Unlike the *Pernod* case, Magens Bay is not generally known as a source of rum, whereas Havana, Cuba is. Nevertheless, the Court in *Pernod* found that the "Havana Club" label was not deceptive because it contained a statement informing consumers where the rum was from.[18] Cardow makes a leap to suggest that by Bellows claiming that its rum is

---

[17] Pernod appealed the Court's decision, and the Third Circuit affirmed. In doing so, it warned that its decision said "nothing about whether the words on the label at issue would be eligible for registration as a trademark," but rather it was focused on whether the phrase "Havana Club" was a misleading statement of geographic origin under § 43(a)(1)(B) of the Lanham Act when considered in the context of Bacardi's rum label. *Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.,* 653 F.3d 241, 256 (3d Cir. 2011).

[18] Bacardi argued that its use of "Havana Club" reflected the Cuban heritage of the rum's recipe which was a Cuban family secret for Cuban rum that used to be sold under the 'Havana Club' label in Cuba until just after the Cuban Revolution. Although the District Court gave this argument considerable weight in its decision, the Third Circuit questioned whether the District Court should have "endeavored to use the modifier 'geographic' to expand the meaning of "origin" into the realm of history, heritage, and culture." *See Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 250 (3d Cir. 2011).

from the Caribbean instead of from a specific country in the Caribbean, it makes a deceptive goods-place association.[19] The Court does not take that leap with Cardow. The label would be deceiving if it stated that the rum was sourced at Magens Bay. It does not. The Court agrees that Bellows' "Magens Bay Rum" label, taken as a whole, does not mislead any reasonable consumer about where "Magens Bay Rum" is made or deceptively indicate rum sourced from Magens Bay or the Virgin Islands.

### d. Geographical Indications.

Even though Bellows' label truthfully identifies its rum as "made with Caribbean Rum," Cardow argues that the mark is not protectable under the Lanham Act because it contains the words "Magens Bay" and an illustrated map of Magens Bay, St. Thomas in the background. ECF No. 46 at 1, 2. Cardow cites Section 2(a) of the Lanham Act (15 U.S.C. § 1052(a)) as expressly stating "that federal registration is to be denied if a trademark used for spirits, such as rum, consists of or contains a geographical indication that identifies a place other than the origin of the rum." ECF No. 46 at 4, n.10. Cardow asserts "there is no doubt that the mark contains a geographical indication (Magens Bay) that is other than the origin of the goods (somewhere else in the Caribbean)." ECF No. 46 at 5. Cardow reasons that Bellows cannot prove it has a protectable trademark or assert a cause of action for trademark infringement because its mark includes a geographical indication other than the origin of its rum. ECF No. 46 at 6.

Title 15 U.S.C. § 1052 provides that:

No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it— (a)Consists of or comprises immoral, deceptive, or scandalous matter; or matter which may disparage or falsely

---

[19] Cardow makes its claim under false designation of Section 43(a)(1)(a) while the plaintiff in *Pernod* claimed false advertising under Section 43(a)(1)(b). "To establish a false advertising claim under § 43(a) of the Lanham Act, the plaintiff must show: "(1) the defendant made false or misleading statements about the plaintiff's product; (2) there is actual deception or a tendency to deceive a substantial portion of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the advertised goods traveled in interstate commerce; and (5) there is a likelihood of injury to the plaintiff, e.g., declining sales and loss of good will." *Rockwell Automation, Inc. v. Radwell Int'l, Inc.,* No. CV 15-5246 (RBK/JS), 2016 WL 7018531, at *5 (D.N.J. Nov. 30, 2016).

> suggest a connection with persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute; or a geographical indication which, when used on or in connection with wines or spirits, identifies a place other than the origin of the goods and is first used on or in connection with wines or spirits . . . .

15 U.S.C. § 1052.

"Geographical indications" are defined as "indications which identify a good as originating in . . . a region or locality. . . *where a given quality, reputation or other characteristic of the good is essentially attributable to its geographical origin.* . . . [T]o invoke the bar of the wines and spirits clause of § 2(a), the opposer or petitioner must allege that the challenged mark is a 'geographic indication' which 'identifies a place,' not just a term that is evocative or suggestive of a geographical place."[20] 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 14:40 (5th ed. 2024) (emphasis added). "What is required is proof that (1) the product for which registration is sought falls within the category of "wines or spirits"; (2) the designation for which registration is sought is a "geographical indication" as defined in the GATT Agreement; (3) the designation identifies a place that is not the "origin" of the wine or spirits; and (4) the designation was first used on or in connection with wines or spirits after January 1, 1996." *Id.*

Rum is clearly a "spirit"; "however, "Magens Bay" is not necessarily a geographical indication. Magens Bay is not a geographical locality known to have a "given quality, reputation, or other characteristic" of rum distilling or sourcing *essentially attributable to Magens Bay's origin*—and Cardow presents no argument otherwise. Given that Magens Bay does not identify as a geographic source of rum, it is not a geographical indication pursuant to 15 U.S.C. § 1052.

### 2. Ownership.

In determining ownership of a trademark, a court considers: 1) priority of use and 2) sufficient market penetration. *See Lucent Info. Mgmt. v. Lucent Techs., Inc.*, 186 F.3d 311, 316-

---

[20] "GIs, like trademarks, are source identifiers. . . . Examples of geographical indications from the United States include 'Florida' for oranges, 'Idaho' for potatoes, 'Vidalia' for onions, and 'Washington State' for apples." USPTO, https://www.uspto.gov/ip-policy/trademark-policy/geographical-indications.

17 (3d Cir. 1999) ("a party must introduce evidence demonstrating that its trademark has achieved market penetration significant enough to pose the real likelihood of confusion among the consumers in that area") (citation omitted).

### a. Priority of Use.

"With respect to ownership of unregistered marks, the first party to adopt a trademark can assert ownership rights, provided it continuously uses it in commerce." *Ford Motor Co. v. Summit Motor Prods.*, 930 F.2d 277, 292 (3d Cir. 1991). This first-in-use approach incorporates "the well-established common law principle of 'first-in-time, first-in-right.'" *Covertech Fabricating, Inc. v. TVM Bldg. Prods.,* 855 F.3d 163, 170 (3d Cir. 2017)*.* It is undisputed that Bellows was "first-in-time" here.

### b. Market Penetration.

The right "to enjoin another from use of the mark, must be based upon actual use and can be enforced only in areas of existing business influence." *Nat. Footwear, Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1395 (3d Cir. 1985). Although market penetration cannot be precisely defined, courts have identified the following four factors as being most relevant to whether a mark has achieved the necessary quantum of market penetration in a given area: 1) the senior user's dollar value of sales at the time the junior user enters the market; 2) the number of customers of the senior user in the area compared to the area's total population; 3) the senior user's relative and potential growth in sales; and 4) the length of time since significant sales were achieved in the area. *Id.* at 1398.

"These factors reflect the principle that no senior user can preempt markets 'before it actually enters them by advertising, reputation, or actual sales.'" *ACCU Pers., Inc. v. AccuStaff, Inc.*, 846 F. Supp. 1191, 1206 (D. Del. 1994) (citing 2 McCarthy § 26.01 [4] at 26–9.). Accordingly, courts should evaluate market penetration as of the time the junior user adopted and began using its trademark. *Id.*

### i. Bellows' dollar value of sales at the time Cardow entered the market.

A court needs to consider the volume of sales in any given area, as well as the growth trends those sales indicate. *Nat. Footwear,* 760 F.2d at 1399. Sales volume is an indicator of market penetration, but it must be more than '*deminimis.*' *See Lucent*, 186 F.3d at 317.

Bellows demonstrates its sales by providing a breakdown of cases sold per year, but it does not provide a breakdown by dollar value of sales for any month or year, including March, 2024 when Cardow entered the market. *See* ECF No. 3 at 3.

> **ii.    Number of Bellows' customers in the area compared to the area's total population.**

Bellows claims that it targets consumers in the Virgin Islands, but Bellows provides no evidence as to the number of its customers compared to the total population.[21]

> **iii.    Bellows' relative and potential growth in sales.**

Bellows has sold a total of 10,173 cases of "Magens Bay Rum." *Id.* It generated over $458,000 of sales from 2006 to May of 2024and experienced its highest gross sales in 2023. *Id.* Bellows demonstrated that it was on a trajectory of increasing sales before it received the cease-and-desist letter from DLCA. Considering it has only sold to one entity on the island, it is conceivable that Bellows could expand its customer base.

> **iv.    Length of time since significant sales were achieved in the area.**

Bellows demonstrates a level of market penetration by its record of continuous and increasing sales under the mark in the Virgin Islands since 2005.

Overall, Bellows has placed little evidence in the record relevant to the above factors which raises questions concerning the level of market penetration it has achieved. Notwithstanding, "a Court may also evaluate whether a party is entitled to a zone of natural expansion if the party has failed to establish market penetration in a particular market." *Laurel Cap. Grp., Inc. v. BT Fin. Corp.*, 45 F. Supp. 2d 469, 482 (W.D. Pa. 1999); *ACCU Personnel, Inc.,* 846 F. Supp. at 1208. "Under this theory, a senior user is entitled to trademark protection in those areas where the senior user is reasonably expected to expand, 'if the have senior user has constantly expanded its business by the date of the junior user's adoption of the mark, and if distances [between the users' markets] are not great. . . even though no actual sales yet been made in that area by the senior user.'" *MNI Mgmt., Inc. v. Wine King, LLC*, 542 F. Supp. 2d 389, 406–07 (D.N.J. 2008) (citing *ACCU Personnel, Inc.,* 846 F. Supp. at 1208).

---

[21] The Court takes note of Cardow's significant argument for measuring consumers based on the Virgin Islands in its entirety as opposed to consumers based on Magens Bay Beach only. *See* ECF No. 46 at 17, 19.

"[W]hen determining whether a junior user falls within the senior user's zone of natural expansion, the Court considers, as of the date the junior user adopted and used the mark, (1) the geographic distance from the senior user's actual location to the perimeter of the claimed zone, (2) the nature of the business and the size of the senior user's zones of market penetration and reputation, (3) the history of the senior user's expansion and assessment as to when the senior user could potentially reach the zone the senior user claims, and (4) whether it would take a "great leap forward" for the senior user to enter the zone; that is, whether expansion into the claimed zone is the next logical step. *MNI Mgmt.,* 542 F. Supp. 2d at 407 (citations omitted).

Bellows has not declared an actual claimed zone, but both parties share the same nature of business. Bellows demonstrates that its sales have continuously increased through 2023 and were on track to continue when Cardow entered the market. This is not necessarily an expansion of business, but since Bellows sold its rum by agreement solely to The Magens Bay Concessions, the area it would reasonably be expected to expand within under such an agreement is likely narrow. Bellows is no longer constrained to that agreement now that Fairchild's has succeeded the former tenant. Lastly, distance between the parties' markets is almost nil. Bellows can reasonably expand, and it wouldn't take a "great leap forward" for Bellows to do so.

### 3. Likelihood of confusion.

Besides demonstrating validity and ownership in the mark, the burden is on Bellows to also show that Cardow's use of the mark "Magens Bay Rum" causes a likelihood of confusion. *See A&H Sportswear,* 237 F.3d at 210-11.

There are two types of "likelihood of confusion" claims: "direct confusion" and "reverse confusion." *Freedom Card, Inc. v. JP Morgan Chase & Co.*, 432 F.3d 463, 470 (3d Cir. 2005). "In a direct confusion case, the consuming public may assume that the established, senior user is the source of the junior user's goods. In a reverse confusion case, the consuming public may assume the converse; that is, that the junior, but more powerful, mark user is the source of the senior user's products." *Checkpoint Sys. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 301 (3d Cir. 2001). The basic issue is the same in both scenarios—

"whether the consuming public is likely to be confused about the source of products of the respective mark users." *Id.* at 302.

Bellows asserts direct confusion here. The essence of its claim is that Cardow, a junior user of the mark, is attempting "to benefit from the hard-earned goodwill in Bellows' 'Magens Bay Rum' mark" and "take advantage of the value of the brand that Bellows has created." ECF No. 3 at 1, 14; s*ee also A&H,* 237 F.3d at 205 (explaining that a direct confusion claim results when "a junior user of a mark is said to free-ride on the reputation and good will of the senior user by adopting a similar or identical mark"); *Fisons Horticulture*, 30 F.3d at 479 (explaining that "the junior user trades on the senior user's good name" and is "therefore saved much of the expense of advertising to create market recognition of its mark").

Regardless of whether the claim is one of direct or reverse confusion, courts have adopted a ten-factor test to determine likelihood of confusion in the marketplace. See *A & H*, 237 F.3d at 212 (quoting *Interpace Corp. v. Lapp, Inc.,* 721 F.2d 460, 462 (3d Cir. 1983)). Commonly known as the *Lapp* factors, they are as follows:

> 1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market.

*Kos Pharms.*, 369 F.3d at 709 (citing *Lapp,* 721 F.2d at 463).

By applying the test, the Court attempts to "move into the mind of the roving consumer and determine whether the labels create the same overall impression when viewed separately." *Checkpoint*, 269 F.3d at 276. "The closer the relationship between the

products . . . and the more similar their sales contexts, the greater the likelihood of confusion." *Lapp,* 721 F.2d at 462 (citation omitted).

 **a. Similarity of Bellows' and Cardow's marks.**

 "The single most important factor in determining likelihood of confusion is mark similarity." *A & H,* 237 F.3d at 216. "The relationship of the products is close enough to lead to the likelihood of confusion when the goods are similar enough that a consumer could assume they were offered by the same source." *Kos Pharms.,* 369 F.3d at 703. *See American Plan Corp. v. State Loan & Finance Corp.,* 365 F.2d 635, 639 (3d Cir. 1966), *cert. denied,* 385 U.S. 1011, 87 (1967) ("Where the names are identical . . . the names in themselves are evidence of likelihood of confusion.").

 Both products are essentially the same: bottles of rum. And both use the same words as marks on their labels: "Magens Bay Rum." The labels, however, are not identical. The typeface is similar, but Bellows' label displays "Magens Bay Rum" all in large capital lettering, while Cardow's label uses large typeface only on "Magens Bay," leaving "Rum" in smaller lettering. In addition, Cardow's label features the shoreline of a beach in the background; Bellows' label displays what appears to be a large hibiscus flower. Although not identical, the marks are similar enough. Given that the exact same products are labeled with nearly the exact same wording, this first factor weighs in favor of Bellows.

 **b. Strength of Bellows' mark.**

 The second *Lapp* factor looks to "the strength of the *owner's* mark." *Lapp*, 721 F.2d at 463 (emphasis added). "Under the Lanham Act, stronger marks receive greater protection" because they "carry greater recognition, [so that] a similar mark is more likely to cause confusion." *Kos Pharms.* 369 F.3d at 715 (citing *A&H*, 237 F.3d at 222). In evaluating the strength of the mark under *Lapp*, courts consider: "(1) the mark's distinctiveness or conceptual strength (the inherent features of the mark) and (2) its commercial strength (factual evidence of marketplace recognition)." *Freedom Card,* 432 F.3d at 472 (citing *A & H*, 237 F.3d at 221).

 First, as addressed earlier, the conceptual strength – or distinctiveness – of a mark is measured by classifying the mark in one of four categories ranging from the strongest to the

weakest: "(1) arbitrary or fanciful (such as 'KODAK'); (2) suggestive (such as 'COPPERTONE'); (3) descriptive (such as 'SECURITY CENTER'); and (4) generic (such as 'DIET CHOCOLATE FUDGE SODA')." *Freedom Card, 432 F.3d* at 472  (citing *A&H*, 237 F.3d at 221). "Stronger marks receive greater protection." *Freedom Card* at 472  (citing *A&H* at 222). Second, in determining a mark's commercial strength, the focus is on marketplace recognition. *Freedom Card* at 472  (citing *A & H* at 223).

Since the two marks are so similar and use the same words, one is not stronger than the other conceptually; however, commercially, Bellows may claim more marketplace recognition based on its continuous use of the mark for nineteen years. *See Lapp,* 721 F.2d at 463 (finding plaintiff's mark to be "a strong one" because plaintiff had used it for over fifty years, and the mark had become "quite distinctive" of the plaintiff's product). Although Cardow has demonstrated significant sales and growth in its short eight months on the market, the Court finds this factor weighs in Bellows' favor.

**c.  Consumer care in purchase.**

The third *Lapp* factor weighs against finding a likelihood of confusion "when consumers exercise heightened care in evaluating the relevant products before making purchasing decisions." *Kos Pharms*., 369 F.3d at 715 (citing *Checkpoint*, 269 F.3d at 284). "The greater the care and attention, the less the likelihood of confusion." *Versa Prods. Co. v. Bifold Co. (Mfg.)*, 50 F.3d 189, 204 (3d Cir. 1995)(citing *Fisons,* 30 F.3d at 476 n.12). There is no evidence in the record of this case as to the level of care and attention consumers exercise in evaluating these competing products. Given that the burden of production is on Bellows as the moving party, the Court finds that this factor weighs against a finding of a likelihood of confusion.

**d.  Length of time Cardow has used the mark "Magens Bay Rum" without evidence of actual confusion arising.**

"When parties have used similar marks for a sufficient period of time without evidence of consumer confusion about the source of the products, there is an inference that future consumers will not be confused either." *Fisons,* 30 F.3d at 476 (citing *e.g. Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1230 (3d Cir. 1978)) (finding no likelihood of

confusion in part because "defendant's mark had been utilized . . . for over forty years without any evidence of actual confusion.").

Although Bellows provides no evidence of actual confusion, it argues that Cardow is creating confusion by selling its product under the same label as Bellows. Cardow began selling rum under the "Magens Bay Rum" label in March 2024, and shortly after, Bellows was ordered to stop selling its label by the DLCA. Little time has passed for evidencing consumer confusion. As such, this factor weighs against a finding of a likelihood of confusion.

### e.  Cardow's intent in adopting the "Magens Beach Rum" mark.

"Evidence of intentional, willful and admitted adoption of a mark closely similar to the existing mark[] weighs strongly in favor of finding [a] likelihood of confusion." *Checkpoint*, 269 F.3d at 286 (quotation omitted); *see also Morgenstern Chem. Co. v. G. D. Searle & Co.*, 253 F.2d 390, 394 (3d Cir. 1958) (finding that defendant "trod a very narrow course when it adopted the name Mictine with full knowledge of the prior use of the name Micturin by the plaintiff"). Notwithstanding, this inquiry extends beyond asking whether a defendant purposely chose its mark to promote confusion and appropriate the prior user's good will. *Fisons*, 30 F.3d at 479*; see e.g. Lapp,* 721 F.2d at 463 (relying on district court's finding that while defendant "may have acted innocently, [it] was careless in not conducting a thorough name search for American uses of the name").

As explained above, the Court finds that, at the very least, it is apparent that Paul de Lyrot failed to carefully evaluate whether the "Magens Bay Rum" mark was already in use for marketing rum. *See supra* section (A)(1)(b)(iii). At worst, de Lyrot intentionally adopted a mark he knew was already in existence. This factor weighs heavily in Bellows' favor.

### f.  Actual Confusion.

Evidence of actual confusion is not required to prove likelihood of confusion. *Checkpoint*, 269 F.3d at 291 (citing *Versa Prods.*, 50 F.3d at 205); *see also Fisons*, 30 F.3d at 476 ("While evidence of actual confusion would strengthen plaintiff's case, it is not essential."). Here, Bellows concedes "there is no evidence of actual confusion." ECF No. 3 at 12.

### g.  Whether Bellows' and Cardow's goods are marketed through the same channels of trade and advertised through the same media.

Under this factor, "courts examine whether buyers and users of each parties' goods are likely to come across the goods of the other, creating an assumption of common source affiliation or sponsorship. . . . The test is whether the goods are similar enough that a customer would assume they were offered by the same source." *Checkpoint*, 269 F.3d at 286 (citation omitted).

Given the similarities between the products and their labels, this strongly implies that buyers and users of the products are likely to encounter both Cardow's and Bellows' products and likely assume they are offered by the same source. Accordingly, the Court finds this factor weighs slightly in favor of Bellows.

**h.  Extent to which the targets of the parties' sales efforts are the same.**

When parties target their sales efforts to the same consumers, there is a stronger likelihood of confusion. *Checkpoint,* 269 F.3d at 289 (citing *Lapp*, 721 F.2d at 463-64); *see Kos Pharms.,* 369 F.3d at 722 ("An example of similar sales efforts would be where "parties target their sales efforts to the same consumers.").

Bellows asserts that "there is significant if not complete similarity in the sales targets of Bellows and Cardow as both seek to sell to U.S. Virgin Islands consumers." ECF No. 3. As mentioned above, Cardow began selling its brand of "Magens Bay Rum" to the same establishment that Bellows had been selling its "Magens Bay Rum" brand to.  The Court finds that this factor weighs in Bellows' favor in light of the similarities presented between the products and the relatively small size of the target market, the Virgin Islands.

**i.  Relationship of the goods.**

This factor focuses on the nature of the *products* themselves, asking whether it would be reasonable for consumers to associate them or see them as related. Courts have recognized that "the near-identity of the products or their similarity of function are key to assessing whether consumers may see them as related."  *Kos Pharms.,* 369 F.3d at 723 (citing *A&H,* 237 F.3d at 215). There is no question as to "the near-identity" of the products. This factor weighs in Bellows' favor.

**j.  Evidence of converging markets and other facts suggesting that the consuming public might expect Bellows to manufacture both products.**

*Island Saints LLC, d/b/a Bellows Int'l v. Cardow, Inc.*
Case No. 3:24-cv-0051
Memorandum Opinion
Page **29** of **31**

"In assessing this factor, courts may look at the nature of the products or the relevant market. . . . or any other circumstances that bear on whether consumers might reasonably expect both products to have the same source." *Kos Pharms.,* 369 F.3d at 724.

The record supports Bellows here because the similarity of the marks, the products, the target market, and the target consumers suggest a likelihood that the consuming public might expect that both products originate from the same source. *See, e.g.*, *Fisons*, 30 F.3d at 480 (evidence that products "are closely related and are used together" and that "other companies market both products" supports finding that [the] public might expect senior user to offer products of junior user); *Lapp*, 721 F.2d at 464 (close relationship between products that may be used together supports finding that "even sophisticated customers . . . would find it natural or likely" that plaintiff might offer product similar to defendant's).

In weighing the Lapp factors, the most important factor— mark similarity— favors Bellows. The parties' products and their target market are also similar, although up to this point Bellows has operated with the intent of only selling its brand to a single vendor. The Court finds that consumers could easily expect both products to be manufactured by a single source. In addition, the Virgin Islands market is relatively small, and Cardow chose a name and mark for its product that was already in use on a similar product. All but three of the ten *Lapp* factors weigh in favor of Bellows. After careful evaluation of the evidence before it, the Court is persuaded that a reasonable factfinder weighing the *Lapp* factors in accordance with the correct legal standards would find Bellows is likely to succeed on the merits of its Lanham Act trademark infringement claim.

### B.  Irreparable Harm.

Injury to goodwill constitutes irreparable harm. *See, e.g., Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 196 (3d Cir. 1990) (finding lack of control over one's mark creates the potential for "damage to reputation [, which] constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark case."). "Once the likelihood of confusion caused by trademark infringement has been established, the inescapable conclusion is that there was also irreparable injury." *Pappan Enters. v. Hardee's Food Sys.*, 143 F.3d 800, 805 (3d Cir. 1998) (citation omitted). The Court could end its

*Island Saints LLC, d/b/a Bellows Int'l v. Cardow, Inc.*
Case No. 3:24-cv-0051
Memorandum Opinion
Page **30** of **31**

analysis here as a matter of law; however, for the sake of thoroughness, we proceed to evaluate the last two factors.

### C. Balance of Hardships

The question here is whether, and to what extent, Cardow will suffer greater harm if a preliminary injunction is issued. *Opticians*, 920 F.2d at 192. "A basic purpose behind the balancing analysis is to ensure that the issuance of an injunction would not harm the infringer more than a denial would harm the mark's owner." *Id.* at 197.

Courts have recognized that "the injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself." *Kos Pharms.,* 369 F.3d at 728 (citing *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharm. Co.,* 290 F.3d 578, 596 (3d Cir.2002)). Courts also recognize that "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor." *Kos Pharms.* at 729 (citing *Novartis* at 597).

If Cardow—the junior user—did not already know Bellows was using the "Magens Bay Rum" mark beforehand, a diligent effort at research would have revealed it. However, as the Court mentioned earlier, it finds this scenario unlikely, given the testimony presented at the preliminary hearing. Cardow introduced its "Magens Bay Rum" to the market relatively recently, and given Bellows' strong showing of likelihood to succeed coupled with the fact that Cardow accepted risk of injury by ignoring Bellows' claim of infringement, the Court is persuaded that no reasonable factfinder could conclude the irreparable harm Cardow might suffer pending resolution of this matter on the merits outweighs the irreparable harm that Bellows would continue to suffer absent an injunction. *See Kos Pharms,* 369 F.3d at 729. Accordingly, this factor weighs in favor of injunctive relief.

### D. Public Interest

"As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *Kos Pharms.,* 369 F.3d at 730 (citing *AT&T v. Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1427 n.8 (3d Cir.1994). Bellows argues that public interest favors

injunctive relief because Cardow's use of Bellows' "Magens Bay Rum" mark is likely to deceive the public. ECF No. 3. The Court agrees.

"The most basic public interest at stake in all Lanham Act cases is the interest in prevention of confusion, particularly as it affects the public interest in truth and accuracy." *Kos Pharms.*, 369 F.3d at 730; *see also Pappan Enters.,* 143 F.3d at 807 ("[p]ublic interest. . . in a trademark case. . . is most often a synonym for the right of the public not to be deceived or confused.") (citation omitted). Accordingly, the Court finds that public interest favors injunctive relief.

## IV.    CONCLUSION

For the reasons stated above, the Court finds that Bellows has demonstrated an entitlement to a preliminary injunction on its claim for trademark infringement under the Lanham Act. An appropriate order follows.

**Date:** November 26, 2024                              /s/  *Robert A. Molloy*
                                                                          **ROBERT A. MOLLOY**
                                                                              **Chief Judge**